UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/17/2015
```

-------------------------------------------------------------------------X

HEATHER N. BIVENS,

                                    Plaintiff,

                -v-

INSTITUTE FOR COMMUNITY LIVING, INC. and
HOWARD GOLDBERG, *Individually and as Associate
Executive Vice-President and Chief Quality and
Compliance Officer*,

                              Defendants.

-------------------------------------------------------------------------X

14 Civ. 7173 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

    By all parties' accounts, Heather Bivens was an excellent employee and supervisor. In June 2012, however, she was fired when her employer, the Institute for Community Living, Inc. ("ICL"), needed to cut its budget. Bivens now brings this gender discrimination lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8–101 *et seq.* ("NYCHRL"). Bivens alleges that she was selected for termination based on her gender, and to spare the job of a male co-worker who was less qualified and less experienced but favored by management because of his gender. The defendants are ICL and Bivens' former supervisor at ICL, Howard Goldberg, who made the decision to fire her.

    Defendants now move to dismiss Bivens' Amended Complaint. For the reasons set forth below, the Court denies the motion to dismiss.

## I.      Background

### A.      Facts[1]

#### 1.      The Parties

Between 1994 and June 14, 2012, Bivens was employed in the "mental health/disability services industry as a counselor, therapist, clinical supervisor, and in various managerial positions."  Dkt. 27 ("Am. Compl."), ¶ 20.  She holds bachelor's and master's degrees in psychology.  *Id.* ¶¶ 17–18.  Before being hired by ICL in 2004, Bivens had "worked as a therapist, program supervisor, in emergency management, outpatient mental health clinics, residential programs, and with various populations including children, adolescents, adults, and families.  Bivens also had experience in state and local government positions in Massachusetts and New York City."  *Id.* ¶ 24.  Between April 2004 and June 14, 2012, Bivens worked in a number of capacities at ICL, as detailed below.

ICL is a New York not-for-profit corporation that "provides recovery, treatment and community living services for people with histories of homelessness, mental illness, intellectual or developmental disabilities, chronic health conditions and/or substance abuse."  *Id.* ¶¶ 8, 22.  ICL serves more than 8,000 individuals each year, and has more than 500 employees.  *Id.* ¶¶ 10, 23.  One of ICL's departments is the Quality Assurance & Improvement Department ("the Department" or "QA").  *Id.* ¶ 26.  The Department's responsibilities include overseeing various mental health programs, ensuring compliance with regulations, investigating internal complaints, and overseeing internal audits.  *See id.* ¶¶ 28–30.  At all relevant times, Goldberg was a Department executive, *id.* ¶ 26, and Bivens' direct supervisor at ICL, *id.* ¶ 14.  The Department

---

[1] These facts are drawn from the Amended Complaint. Dkt. 27.  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff, Bivens.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

had about 10 employees total, including Goldberg.  The industry is predominantly female, *id.*
¶ 72:  For the first seven years that Bivens worked at ICL—namely, 2004–2011—the
Department had no men, besides Goldberg.  *Id.* ¶¶ 71, 89.  In 2012, Goldberg hired a man,
Nickolas Garin.  *Id.* ¶ 61.  The series of events involving Goldberg's hiring of Garin, and his
decision to retain Garin while terminating Bivens, are reviewed in detail below.

### 2.       Bivens' Employment at ICL: The first seven years (2004–11)

In 2004, Goldberg hired Bivens as "Director of Mental Health Services for Quality
Assurance and Improvement," a position she held for four years.  *Id.* ¶¶ 21, 31.  As a Director,
she "chaired the agency's Mental Health Incident Review Committee; conducted internal
investigations of complaints; was responsible for hiring and training new Quality Assurance
staff; and was ICL's primary QA liaison to the New York State Commission on Quality of Care
& Advocacy for Persons with Disabilities [] and the N.Y.S. Office of Mental Health."  *Id.* ¶ 30.
Bivens was also tasked with, *inter alia*, "develop[ing] the Department with Goldberg."  *Id.* ¶ 26.

Bivens was successful in these roles.  Through interviewing and hiring, she helped build
QA so that it had "a full complement of staff."  *Id.* ¶ 27.  And during her four-year tenure as a
Director, "the number of mental health programs for which she provided audit oversight grew
from about eighty to over one hundred programs.  These programs included day treatment,
supportive housing, shelters, case management, residential and outpatient treatment programs."
*Id.* ¶ 28.  She also "manag[ed] the internal QA audit process, ensur[ed] compliance with state,
federal and agency regulation, and provid[ed] technical assistance."  *Id.* ¶ 29.  "Under Bivens'
directorship, for the first time 100% of ICL's programs received annual internal audits."  *Id.*
¶ 43.  The system that Bivens implemented "significantly increased communications and
monitoring between department and agency."  *Id.*  In addition, Bivens "developed a process to

ensure the appropriate and timely report of incidents, which . . . led to ICL avoiding citations." *Id.* Bivens also chaired five different ICL committees. *Id.* ¶ 47. She was "the only ICL Director charged with oversight of agency-wide functions." *Id.* ¶ 45.

Effective July 1, 2008, Bivens was promoted to Associate Vice President ("AVP") of the Department. *Id.* ¶ 31. In that role, she "continued performing oversight and management of city, state and federal audits of ICL"; Bivens also "supervised the development and distribution of department reports and supervised ICL's incident management system," and "supervis[ed] the Director of QA and Improvement for Intellectual and Developmental Disabilities Services." *Id.* ¶¶ 31–33. Further, Bivens oversaw three successful accreditation surveys (in 2004, 2007, and 2010), conducted by the Commission on Accreditation of Rehabilitation Facilities International ("CARF"). *Id.* ¶ 50.

In spring 2011, Bivens was promoted to Associate Senior Vice President ("ASVP") of the Department. *Id.* ¶ 34. In this position, Bivens "provided QA/QI oversight for all programs" and supervised the person who had succeeded her as AVP. *Id.* ¶ 35. As an ASVP, Bivens also "served as Chief Investigator with responsibility for oversight of ICL-wide internal investigations," which included training and supervising the agency's 14 investigators. *Id.* ¶ 49. Bivens successfully mentored a number of subordinates, as well. *Id.* ¶ 51. In addition, Goldberg's job duties required his absence from the office for about two weeks every quarter; in Goldberg's absence, Bivens supervised the Department, including taking responsibility for "all compliance and QA/QI matters." *Id.* ¶¶ 36, 52.

Bivens' annual employee performance evaluations reflected her success at ICL. These evaluations were conducted on a 1–5 scale, with 5 being the highest. On this rating scale, a "3" indicated that an employee's performance consistently met expectations, a "4" meant that her

performance met and often exceeded expectations, and a "5" indicated that her performance

"consistently exceeds standards and expectations." *Id.* ¶ 38.  Employees were evaluated in about

12 different categories. *Id.* ¶¶ 40–41.  Bivens' evaluations were as follows; the number in bold is

the average of her ratings in the 12 categories:

> April 2004–July 2004: **3.8**
> July 2005–June 2006: **4.62**
> July 2006–June 2007: **4.63**
> July 2007–June 2008: **4.79**
> July 2008–June 2009: **4.88**
> July 2009–June 2010: **4.92**
> July 2010–June 2011: **4.95**

*Id.* ¶ 39.

Goldberg's written comments about Bivens accord with these positive—and consistently

improving—numerical performance reviews.  When Bivens was a Director, Goldberg praised

her technological skills and capacity to learn quickly. *Id.* ¶ 130.  He also wrote that "Heather

exceeded expectations with her initiative and took on a leadership role in preparing for CARF," a

period in which "all levels of staff sought her counsel." *Id.* ¶ 50.  In a 2008–09 evaluation,

Goldberg praised Bivens' supervision and mentorship, stating: "Heather maintains a motivating

environment for her staff, empowering them to learn and develop new skills." *Id.* ¶ 53.  In a

2010–11 evaluation, Goldberg praised Bivens' work ethic and knowledge, stating:  "Heather

does whatever is needed to complete assignments, including working past normal scheduled

hours when necessary. . . .  Heather demonstrates an excellent understanding of the regulations

and agency policies governing corporate compliance." *Id.* ¶ 121.

With respect to compensation, during her first seven years at ICL (2004–11), Bivens

received multiple cost-of-living increases and two outright raises, each occurring when she was

promoted.  Her starting salary as a Director was $69,000; her AVP salary was about $81,000;

and her ASVP salary was $97,000.  *Id.* ¶ 42.  Before obtaining these promotions and raises,

Bivens had to lobby Goldberg for "several years."  *Id.* ¶ 86.

### 3.       Goldberg Seeks, and Eventually Hires, a Male Employee

In September 2011, ICL Director Jo Casso retired, creating a vacancy.  *Id.* ¶ 54.  Casso,

who is female, had been a Director in the Risk Management Section of the Department.  *Id.*

Shortly after Casso announced her retirement, Bivens "expressed interest in taking on Casso's

duties" during a meeting with Goldberg.  *Id.* ¶ 56.  Bivens noted her experience in this area and

her good relationships with Casso's staff.  *Id.*  However, "Goldberg dismissed this notion out of

hand."  *Id.*  In or about October 2011, during another meeting with Goldberg, "Bivens again

expressed her interest in taking over Casso's job duties.  This conversation was much shorter

than the September 2011 conversation as Goldberg appeared irritated at her suggestion."  *Id.*

¶ 57.

In or about October 2011, Goldberg told Bivens and other Department members that, at a

conference, he had met a man named Nickolas Garin, and "he was the one."  *Id.* ¶ 58.  "Goldberg

expressed his determination to Bivens and other staff to convince Nick Garin [] to apply for the

[] Director position.  When Garin indicated that he was not interested in the job[,] Goldberg was

visibly disturbed.  Goldberg persisted until Garin applied for the position."  *Id.* ¶ 59.  "Over half

of the [] Director job was supervising" employees.  *Id.* ¶ 64.  Another aspect was supervising

auditing and, at times, "directly auditing agency programs, financial systems, and a variety of

federal, state and city regulations."  *Id.* ¶ 123.

At the time he applied, Garin was six months out of graduate school, had two years of

work experience, and had no supervisory experience; his "only experience with audits was

performing mock audits."  *Id.* ¶¶ 1, 65–67.  By contrast, another applicant—Kim McCain, a

6

woman—had 15 years of experience in the industry and had previously supervised about 70 people. *Id.* ¶ 60. Garin was hired over McCain. *Id.* ¶ 62. His starting salary was $75,000. *Id.* ¶ 100.

Garin was treated preferentially in a number of respects. Before Garin even interviewed with ICL, Goldberg had invited Garin to help revise the job description for the position Garin had applied for; Garin thereupon did so. *Id.* ¶ 68. Although Garin did not begin working at ICL until February 2012, Goldberg invited him to attend the December 2011 holiday party; "[s]taff expressed concerns regarding the excessive amount of time and attention Goldberg provided to Garin." *Id.* ¶ 61. Goldberg also fought for Garin to get preferential benefits: It typically takes about three months, after being hired, for an employee to begin receiving ICL health insurance coverage, but Goldberg urged ICL "before Garin's hire to cover his COBRA payments until his ICL health coverage took effect"—an accommodation "reserved for a few select executives," if any. *Id.* ¶¶ 78–79.

Once Garin started working at ICL, he continued to receive preferential treatment. For instance, Goldberg sent Garin to Arizona for corporate compliance training, but refused McCain's request for similar training. *Id.* ¶ 84. Goldberg also invited Garin to attend meetings "for executive and senior management," even though "Bivens was not invited to attend [such meetings] until she had worked at ICL for five years and more than a year after her promotion" from Director (Garin's position) to AVP. *Id.* ¶¶ 90–91. Goldberg spent far more time mentoring, and meeting with, Garin than with any of his female subordinates. *Id.* ¶ 89. Further, "[e]arly in Garin's tenure[,] Goldberg repeatedly informed [D]epartment staff that he wanted to see Garin 'move up' in the [D]epartment." *Id.* ¶ 82. Several ICL employees "voiced concerns

regarding the substantial amount of time Goldberg spent with Garin before and after his hire at ICL." *Id.* ¶ 81.

Shortly after Garin's hire, Goldberg "expressed great relief to Aimee Gerst and Heather Bivens . . . that, after about nine years in QA/QI, 'I finally have a guy in QA.'" *Id.* ¶¶ 71, 89. Goldberg publicly praised Garin and his potential. *Id.* ¶¶ 69, 74.

### 4. Bivens Fights for Female Subordinates, Criticizes Garin, and is Fired

Within weeks of Garin's hiring, Bivens told Goldberg that Garin was in "over his head" and "appeared to lack confidence." *Id.* ¶ 75. Goldberg acknowledged that Garin was "green" and lacked relevant work experience. *Id.* ¶ 77. He asked Bivens to mentor Garin, which she did. *Id.*

Goldberg's female subordinates did not receive the "red carpet" treatment Garin received. A number of these women—including Linda Nagel, Deborah Roberson, Daphne Dent, and Pamela Tindall-O'Brien—"regularly" were subjected to Goldberg's "demeaning comments" about their intelligence, weight, attire, and/or appearance. *Id.* ¶ 111. Goldberg also told a co-worker that "women have to make a choice between working and raising children." *Id.* ¶ 112. Bivens also repeatedly sought to persuade Goldberg to award many of these women raises and promotions, which Bivens contends were merited. For instance, Aimee Gerst was a Director in the Department. *Id.* ¶ 104. Despite Gerst's "excellent performance and increased job duties as Director, it took Bivens more than three years to convince Goldberg to promote Gerst to Associate Vice-President." *Id.* ¶ 107. Similarly, "QA Specialists Diane Martin, Joanna Lewicki and Daphne Ramirez had all worked in QA for about five to seven years and all received strong performance evaluations without a merit salary increase . . . . Goldberg turned down Bivens['] repeated requests to increase their respective salaries, which were all in the low fifty thousand

dollar range." *Id.* ¶ 108.  Weeks before her termination, Bivens again approached Goldberg "seeking his approval for salary increases for Martin, Lewicki and Ramirez.  Bivens informed Goldberg that if he yet again declined these salary increases, that she would bring her requests directly to HR." *Id.* ¶ 109.

On June 14, 2012, Bivens was fired.  Goldberg told her that, for economic reasons, her position had been eliminated. *Id.* ¶ 115.  Bivens was not offered a transfer or a pay cut. *Id.* ¶ 140.  "When Goldberg decided to terminate Bivens, she was the only employee in QA . . . to criticize Garin's performance, as well as Goldberg's plan for Garin's rapid advancement in ICL." *Id.* ¶¶ 116–17.  By firing Bivens, Goldberg "got rid of the highest titled Department employee advocating fair compensation/promotion for female staff, including herself." *Id.* ¶¶ 118.

As to the economic reasons Goldberg alluded to, "Goldberg allegedly was directed to cut" about $100,000 from his budget. *Id.* ¶ 147.  At the time of her termination, Bivens' salary was $97,000. *Id.* ¶ 42.  "Bivens' termination caused Goldberg to delegate some of her duties to" Department employees Aimee Gerst and Ogé Amadi-Mitchell. *Id.* ¶ 146.  As a result of Gerst and Amadi-Mitchell's increased job duties, their "respective salaries were increased in the aggregate nearly" $15,000. *Id.*  Had ICL and Goldberg terminated Garin instead of Bivens, ICL "would have saved . . . close to $100,000" by cutting Garin's $75,000 salary and his fringe benefits, and by not having to pay the nearly $15,000 in salary increases paid to Amadi-Mitchell and Gerst. *Id.* ¶ 147.

### B.  Procedural History

On October 3, 2012, Bivens filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against ICL. *Id.* ¶ 15.  On August 15, 2014, the EEOC issued a Notice of Right to Sue Letter to Bivens. *Id.* ¶ 16.

On September 5, 2014, Bivens initiated this case by filing her original Complaint. Dkt. 2. On October 21, 2014, defendants answered. Dkt. 10. On December 23, 2014, defendants moved to dismiss. Dkt. 16. On January 15, 2015, Bivens filed an Amended Complaint, which today is the operative complaint. Dkt. 27.

On February 17, 2015, defendants moved again to dismiss, Dkt. 38, and submitted a memorandum of law in support, Dkt. 39 ("Def. Br."). Defendants there argue that the Amended Complaint "does not allege facts from which gender-based discrimination may be plausibly inferred." Def. Br. 6. On March 5, 2015, Bivens submitted a brief in opposition. Dkt. 44 ("Pl. Br."). On March 12, 2015, defendants submitted a reply brief in further support of their motion. Dkt. 45 ("Def. Reply Br."). On April 10, 2015, the Court held argument, and stated that it intended to deny defendants' motion to dismiss, with a written decision—this Opinion—to follow. *See* Dkt. 48.

## II.      Applicable Legal Standards

### A.      Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court "must accept as true all well-pleaded factual allegations in the complaint, and 'draw[] all inferences in the plaintiff's favor.'" *Allaire*

*Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## B.    Discrimination Law

### 1.    Title VII

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).[2]  A *prima facie* case of employment discrimination under Title VII requires proof that: "(1) plaintiff is a member of a protected class; (2) plaintiff was qualified for his or her position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving a rise to an inference of discrimination based on plaintiff's membership in the protected class." *El-Din v. N.Y.C. Admin. for Children's Servs.*, No. 12 Civ. 1133 (PAE), 2012 WL 3839344, at *4 (S.D.N.Y. Sept. 5, 2012) (citing *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)). "The *sine qua non* of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be *because of* sex.'"

---

[2] Individuals are not subject to liability under Title VII. *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *Rozenfeld v. Dep't of Design & Const. of City of N.Y.*, 875 F. Supp. 2d 189, 201 (S.D.N.Y. 2012). Accordingly, Bivens cannot—and has not sought to, *see* Am. Compl. ¶¶ 155, 157—state Title VII claims against the individual defendant, Goldberg. Bivens does, however, pursue claims against Goldberg under the NYCHRL. *See id.* ¶ 159.

*Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (emphasis in original) (quoting *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001)).

However, to survive a motion to dismiss, "plaintiffs alleging employment discrimination need not plead a *prima facie* case." *Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *4 (S.D.N.Y. Apr. 30, 2013). Nevertheless, the elements of the *prima facie* case "provide an outline of what is necessary to render a plaintiff's . . . claims for relief plausible." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 461 (S.D.N.Y. 2013) (internal quotation marks and alterations omitted); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 515 (2002). Thus, courts "'consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the grounds on which it rests.'" *Wilson v. N.Y.C. Dep't of Corr.*, No. 11 Civ. 9157 (PAE), 2013 WL 922824, at *4 (S.D.N.Y. Mar. 8, 2013), *reconsideration denied*, 2013 WL 1430768 (S.D.N.Y. Apr. 9, 2013) (quoting *Murphy v. Suffolk Cnty. Cmty. Coll.*, No. 10 Civ. 0251 (LDW) (AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011)). A claim is properly dismissed where the plaintiff "fail[s] to plead any facts that would create an inference that any adverse action taken by . . . [any] defendant was based upon [a protected characteristic of the plaintiff]." *Patane*, 508 F.3d at 112 (citation omitted) (first two alterations in original).

### 2.    The NYCHRL

Section 8–107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1)(a). "To establish a gender discrimination claim

under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); *see also Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 264 (2d Dep't 2011) (adopting the same standard of liability). This is a lower standard than the federal standard. *See, e.g.*, *Mihalik*, 715 F.3d at 109–10. Thus, if a court dismisses a federal claim but exercises supplemental jurisdiction over the local claim, it "must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* at 109 (quoting *Albunio v. City of New York*, 922 N.Y.S.2d 244, 246 (2011)) (internal citations omitted).

Here, the Court will undertake the federal analysis first. If Bivens' allegations state a claim under federal law, no further analysis is required—they will also necessarily state a claim under the NYCHRL. *See Mihalik*, 715 F.3d at 109 ("[I]nterpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall.'") (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)); *Williams*, 872 N.Y.S.2d at 33 n.9 ("The New York City Human Rights Law was intended to be more protective than the state and federal counterparts.") (citation omitted).

## III. Discussion

The first three aspects of the federal *prima facie* case are not in dispute: Bivens is a member of a protected class, she was qualified for her position, and she suffered an adverse employment action (her termination). The fourth element is, however, disputed: whether the Amended Complaint satisfactorily alleges that her firing "took place under circumstances giving

a rise to an inference of discrimination based on plaintiff's membership in the protected class."

*Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014) (quoting *El-Din*,

2012 WL 3839344, at *4). Defendants contend that Bivens does not allege facts from which

gender-based discrimination may be plausibly inferred. The Court holds otherwise.

As the Second Circuit has explained, "[i]t is well-settled that an inference of

discriminatory intent may be derived from a variety of circumstances, including, but not limited

to: . . . 'the employer's criticism of the plaintiff's performance in [sexually] degrading terms; or

its invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to the

plaintiff's discharge.'" *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) and citing *Carlton v. Mystic*

*Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204

(2d Cir. 1995); *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 113 (2d

Cir. 1992)). With respect to an employer's comments, the Circuit has stated that "[t]he relevance

of discrimination-related remarks does not depend on their offensiveness, but rather on their

tendency to show that the decision-maker was motivated by assumptions or attitudes relating to

the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007),

*abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Applying these principles, and accepting Bivens' well-pleaded allegations as true, as the

Court must at this stage, gender-based discrimination may be plausibly inferred. Several facts,

when viewed in combination, support this conclusion:

1. *Goldberg's alleged exuberance upon hiring a man*: Upon hiring Garin, Goldberg

   exclaimed, "I finally have a guy in QA." Am. Compl. ¶ 71.

2. *Goldberg's allegedly preferential treatment of Garin as compared to women*:  Goldberg permitted Garin to attend trainings in Arizona even though Goldberg denied the same permission to women, such as Kim McCain.  *Id.* ¶¶ 83–84.  Goldberg immediately invited Garin to attend exclusive executive level meetings—an opportunity that Goldberg had denied to women until they had several years of experience.  *Id.* ¶¶ 90–91.  Notwithstanding his inexperience, Garin's starting salary was higher than those of women in the Department.  *Id.* ¶¶ 100, 101, 106.  And Goldberg spent significantly more time mentoring Garin than any female staff member.  *Id.* ¶ 89.  Goldberg even let Garin write the job description for his position before Garin had interviewed.  *Id.* ¶ 68.

3. *Goldberg's comments*:  Goldberg openly praised Garin and his potential (despite Garin's lack of experience and underwhelming initial performance), whereas Goldberg routinely and openly criticized certain women's intelligence, appearance, weight, and attire.  *Id.* ¶¶ 69, 74, 111.  Goldberg also told a co-worker that "women have to make a choice between working and raising children."  *Id.* ¶ 112.

4. *Goldberg's alleged general practice of blocking or delaying women's promotions and raises*:  Despite giving strong reviews to Bivens and others, such as Aimee Gerst, Goldberg blocked or significantly delayed their ability to obtain merited raises and promotions.  *Id.* ¶¶ 86, 107–09.

5. *Garin's alleged lack of qualifications*:  The position for which Garin was hired included (1) supervising others, which Garin had never done, and (2) conducting or overseeing governmental and internal audits, with which Garin also had no experience, save for mock audits.  *Id.* ¶¶ 65–66.  Garin was hired over a woman, McCain, with 15 years of supervisory experience.  *Id.* ¶ 60.

6. *Goldberg's alleged departure from ICL's "last hired, first fired" practice*:  As alleged by Bivens, the "last hired" employee at ICL was typically the first to be fired when necessary, but that practice was not followed in her case.  *Id.* ¶ 137.  Instead, a recently hired, unproven male, Garin, was retained, whereas a highly qualified, experienced, and successful female, Bivens, was fired.

7. *Bivens vs. Garin*:  Bivens—as defendants concede—had first-rate qualifications, experience, and an "excellent" record.  *Id.* ¶¶ 39, 121; *see also* Def. Br. 1 (calling Bivens "an excellent employee" who "consistently" had "excellent performance reviews").  By contrast, Garin was inexperienced, allegedly underqualified, and in "over his head."  Am. Compl. ¶ 75.

8. *The alleged suspicious timing of Bivens' termination*:  Bivens had been lobbying Goldberg for raises for her female subordinates, and—just weeks before her termination—she had threatened to take her complaints directly to Human Resources, if Goldberg again declined to award these women raises.  *Id.* ¶¶ 108–09.  In addition, Bivens was the sole member of the Department to criticize Garin in the few months that she and Garin overlapped; Bivens told Goldberg that Garin was in "over his head" and lacked confidence in his interactions.  *Id.* ¶ 75.  Bivens thus emerged as the sole obstacle to Goldberg's stated desire to see Garin quickly "move up" in the Department.  *Id.* ¶ 82.

Under these circumstances, the Court comfortably concludes that, in combination, these alleged gender-based comments, disparities in treatment, and suspicious timing plausibly permit the conclusion that Goldberg's decision to fire Bivens while retaining Garin was gender-based. *See Leibowitz*, 584 F.3d at 502; *Chambers*, 43 F.3d at 37.  The Amended Complaint, in fact, paints a multifaceted portrait of favoritism by Goldberg based on gender.  And the facts pled

readily permit the conclusion that Goldberg viewed his sole male employee in the group, Garin, as untouchable *because* of his gender.  By contrast, Goldberg viewed his "excellent" female employee—the sole critic of Garin, and the person who fought for women's promotions and salaries—as expendable.

Defendants make four arguments as to why the Amended Complaint should nevertheless be held deficient.  First, they argue, Bivens has pled a non-discriminatory reason for her own termination.  Bivens' pleadings, defendants note, support that Bivens' "position was eliminated as part of an agency-wide reduction-in-force," and a reduction in force "may be a legitimate, non-discriminatory reason for termination."  Def. Br. 7.  But this argument is unpersuasive, because while "a reduction-in-force or restructuring that results in an elimination of jobs often is a legitimate reason for dismissing an employee[,] . . . such a reduction is not always the whole story."  *Tarshis v. Riese Org.*, 211 F.3d 30, 37 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz*, 534 U.S. at 510–12.  Here, Bivens' allegation is that, when Goldberg needed to pare personnel costs, he used *gender* as a basis for deciding which employee to eliminate.  *See* Am. Compl. ¶¶ 136, 148, 149.  Where, as here, such an allegation is supported by well-pled factual assertions, a valid claim has been stated, notwithstanding that the initial impetus for the termination was budgetary.  *See, e.g.*, *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (noting that a reduction-in-force must be "conducted on an unbiased basis"), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 13 (2000); *Burger v. Litton Indus., Inc.*, No. 91 Civ. 0918 (WK) (AJP), 1996 WL 421449, at *14 (S.D.N.Y. Apr. 25, 1996), *report and recommendation adopted*, No. 91 Civ. 0918 (WK), 1996 WL 609421 (S.D.N.Y. Oct. 22, 1996) (denying defendant's motion for summary judgment because "a material factual dispute exists as to whether [plaintiff's] layoff was the result of a general financial reduction in

force or whether, despite the reduction in force, she was terminated for discriminatory reasons"). In other words, a reduction-in-force that is implemented in a gender discriminatory fashion is unlawful. *Burger*, 1996 WL 421449, at *14. Bivens has so pled here.

Second, defendants argue, Bivens' claim of gender bias is implausible in light of the "same-actor inference," to wit, the fact that Goldberg, "who had a history of giving plaintiff excellent performance reviews and recommended her for raises and promotions, is the same person who recommended that plaintiff's position be eliminated." Def. Br. 8. "The premise underlying [the same-actor] inference is that if the person who fires an employee is the same person that hired [her], one cannot logically impute to that person an invidious intent to discriminate against the employee. Such an inference is strong where the time elapsed between the events of hiring and firing is brief." *Carlton*, 202 F.3d at 132. However, the same-actor inference is just that—an inference—and not a hard-and-fast rule. The force of that inference will vary depending on the facts. *See, e.g.*, *id.* at 132, 138 ("[T]he inference is less compelling when a significant period of time elapses between the hiring and firing. . . . [T]he enthusiasm with which the actor hired the employee years before may have waned with the passage of time because the relationship between an employer and an employee, characterized by reciprocal obligations and duties, is, like them, subject to" change.) (citations omitted).

It is well-settled that a change of material circumstances is a factor that justifies according less weight to the same-actor inference. *See Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) ("Feingold's complaints of discrimination could be found to have altered the circumstances of his employment: Viewing the evidence in the light most favorable to the plaintiff, after complaining about discrimination Feingold became not merely a white Jew but a white Jew who (allegedly unlike Schulgasser) would not tolerate a discriminatory office

culture."). Bivens has pled such a change of circumstances here—specifically, Garin's entry into the picture at ICL in late 2011/early 2012, months *after* Bivens' final promotion. The Amended Complaint pleads that Garin's hire as the first male employee in Goldberg's group materially changed the landscape, opening the door for the first time to preferential treatment by Goldberg of a male employee over females, including Bivens. As pled, Goldberg's actions in connection with the recruitment, hiring, and treatment of Garin all reflected favoritism towards this single male employee, and after Bivens emerged as a critic of Garin's, she was fired. On these facts, the same-actor inference, based on Goldberg's earlier support of Bivens, is relatively weak.

Third, defendants discount "[t]he stray remarks" attributed to Goldberg as "remote in time and unrelated to gender." Def. Reply Br. 1; *see also id.* at 4. Although defendants are at liberty to so argue to a trier of fact, on a motion to dismiss, the statements attributed to Goldberg in the Amended Complaint must be viewed in the light most favorable to Bivens and are not so easily diminished. The Amended Complaint alleges that Goldberg was overtly exuberant about having hired a male—"I finally have a guy in QA." Am. Compl. ¶ 71. This facially gender-related comment is relevant context for viewing Goldberg's later treatment of Garin, on the one hand, and Bivens (and other female employees), on the other. Defendants focus on a different gender-related comment by Goldberg, in which he allegedly told "a co-worker that 'women have to make a choice between working and raising children.'" Def. Br. 15 (citing Am. Compl. ¶ 112). But even if this comment were assigned little significance, Goldberg's statement that he was thrilled to have finally hired "*a guy*" is probative. It supports Bivens' claim that Goldberg's favorable treatment of Garin over the females under his supervision, including ultimately retaining him over Bivens, reflected gender bias.

19

Finally, defendants argue that Goldberg's differential treatment of Garin vis-à-vis female employees does not bespeak gender discrimination because these women were not "similarly situated" to Garin in, for example, experience and compensation.  But as the Second Circuit has recognized, whether two employees are similarly situated often cannot be resolved at the pleading stage:

> To establish an inference of discrimination, a plaintiff must allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  [*Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)] (internal quotation marks omitted).  What will constitute "all material respects" will vary from case to case, of course.  We have said that the judgment rests on "whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards." *Id.* at 40.  The plaintiff's and comparator's circumstances must bear a "reasonably close resemblance," but need not be "identical." *Id.*  Ordinarily, "[w]hether two employees are similarly situated . . . presents a question of fact," rather than a legal question to be resolved on a motion to dismiss. *Id.* at 39.

*Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014).

Here, defendants argue, Garin and Bivens held different positions and had different levels of experience.  But, on the facts pled, those distinctions do not necessarily undermine the inference of discrimination.  On the contrary, one basis for Bivens' claim of gender discrimination is, in part, that she was so plainly *better* qualified than Garin that Goldberg's curious decision to expel her and retain Garin suggests an ulterior motive—gender bias.  Put differently, as pled, Bivens and Garin were "similarly situated" as to the key criteria at issue at the time of her termination:  They were in the same group of 10 employees, of whom Goldberg, for budgetary reasons, needed to terminate one so as to permit him to save approximately $100,000.  *See id.*; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–55 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently

similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

For these reasons, the Court holds that Bivens' Amended Complaint has stated a valid claim of federal gender discrimination. It remains, of course, to be seen whether discovery validates, strengthens, or weakens this claim. And because Bivens' federal claim survives, it follows that her city law claim for gender discrimination, which is subject to a less demanding standard, survives as well. *See Mihalik*, 715 F.3d at 109–10; *Williams*, 872 N.Y.S.2d at 33 n.9.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss the Amended Complaint. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 34 and 38.


SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: April 17, 2015
     New York, New York